# In the United States Court of Appeals for the Fifth Circuit

**NO. 24-20551**

FREDRIC A. GUENTHER, WALTON FUJIMOTO, LES OWEN,
PLAINTIFFS — APPELLEES

V.

BP RETIREMENT ACCUMULATION PLAN and BP CORPORATION
NORTH AMERICA, INCORPORATED,
DEFENDANTS — APPELLANTS

On Appeal from the U.S. District Court
for the Southern District of Texas
No. 4:16-CV-00995

## BRIEF OF APPELLANTS

Ian H. Morrison
SEYFARTH SHAW, L.L.P.
Suite 8000
233 S. Wacker Drive
Chicago, IL 60606
(312) 460-5830
imorrison@seyfarth.com

George W. Hicks, Jr.
 *Counsel of Record*
Megan L. McGlynn
Alanna Ruth Carden
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
george.hicks@kirkland.com

*Counsel for Appellants*

July 7, 2025

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

**APPELLANTS:**

The Appellants are the BP Retirement Accumulation Plan and BP Corporation North America, Inc.

**ATTORNEYS FOR APPELLANTS:**

Ian H. Morrison
Seyfarth Shaw, L.L.P.
Suite 8000
233 S. Wacker Drive
Chicago, IL 60606
(312) 460-5830
imorrison@seyfarth.com

George W. Hicks, Jr.
Megan L. McGlynn
Alanna Ruth Carden
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington, DC  20004
(202) 389-5000

**APPELLEES:**

The Appellees are Fredric A. Guenther, Walton Fujimoto, and Les Owen.

**ATTORNEYS FOR APPELLEES:**

Rossi Maddalena
Philip Randolph Meade
Peter Steilberg
Merrick, Hofstedt & Lindsey, P.S.
3101 Western Avenue
Suite 200
Seattle, WA 98121

Susan Weeks
Leander Laurel James, IV
James, Vernon & Weeks, P.A.
1626 Lincoln Way
Coeur d'Alene, ID 83814
(208) 667-0683

s/ *George W. Hicks, Jr.*

Attorney for Appellants

i

## STATEMENT REGARDING ORAL ARGUMENT

Appellants submit that oral argument is warranted.  This case comes to this Court after nine years of litigation, numerous rulings below, and a fourteen-day bench trial culminating in a lengthy decision holding Appellants liable for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA").  That decision is flawed in numerous respects, however.  Given the voluminous record and number of legal issues this appeal implicates, Appellants submit that oral argument will aid the Court in better understanding the many grounds on which judgment should be reversed.

**TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ................................................i

STATEMENT REGARDING ORAL ARGUMENT............................................ ii

TABLE OF AUTHORITIES ............................................................... v

INTRODUCTION ...........................................................................1

STATEMENT OF JURISDICTION ....................................................3

STATEMENT OF ISSUES ...............................................................4

STATEMENT OF THE CASE AND FACTS.........................................4

      A.    BP America's Conversion of the ARP to the RAP...................4

      B.    Communications Regarding the RAP.........................................6

      C.    Plaintiffs' 2011 Concerns About the RAP..............................11

      D.    Proceedings Below ....................................................................14

SUMMARY OF ARGUMENT .........................................................20

STANDARD OF REVIEW ...............................................................25

ARGUMENT ...................................................................................25

I.     Plaintiffs Lack Constitutional Standing. ...................................25

II.    Plaintiffs' Suit Is Untimely. ........................................................35

      A.    Plaintiffs' Claim Is Subject to §413's Statute of Repose. ........35

      B.    Plaintiffs' Claim Is Time-Barred Under §413. .........................38

III.   The District Court Erred In Determining That Defendants Breached Their Fiduciary Duty. ...........................................45

A.  Defendants Cannot Be Liable for Breach of Fiduciary Duty Because They Were Not Fiduciaries With Respect to the Wrongs Alleged.................................................45

B.  The District Court's Fiduciary-Breach Determination Rested on Findings that Violate the Law-of-the-Case Doctrine and Are Clearly Erroneous.........................................54

IV.  The District Court Abused Its Discretion in Certifying the Class.......65

A.  The Class Is Not Ascertainable...................................................66

B.  The Class Lacks Sufficient Commonality. ...............................69

C.  The Class Does Not Satisfy Rule 23(b)(2). ..............................72

CONCLUSION .............................................................................................75

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A. by & through P.A. v. Phillips*,
   2023 WL 334010 (5th Cir. Jan. 20, 2023) .........................................................66

*Acosta v. Pac. Enters.*,
   950 F.2d 611 (9th Cir. 1991), *as amended on reh'g* (Jan. 23, 1992) ...............46

*Adams v. Brink's Co.*,
   420 F.Supp.2d 523 (W.D. Va. 2006), *aff'd*, 261 F.App'x 583
   (4th Cir. 2008)....................................................................................................44

*Agenbroad v. McEntire*,
   595 F.App'x 383 (5th Cir. 2014) .......................................................................53

*Agency for Int'l Dev't v. Alliance for Open Society Int'l Inc.*,
   591 U.S. 430 (2020)............................................................................................50

*AGI Consulting L.L.C. v. Am. Nat'l Ins. Co.*,
   798 F.App'x 296 (10th Cir. 2020) ...............................................................41, 43

*Amara v. CIGNA Corp.*,
   775 F.3d 510 (2d Cir. 2014) ........................................................................*passim*

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
   579 F.Supp.3d 1133 (N.D. Cal. 2022), *aff'd*, 137 F.4th 1015 (9th
   Cir. 2025)............................................................................................................33

*Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*,
   99 F.4th 928 (7th Cir. 2024)...............................................................................41

*Balsley v. Delta Star Emp. Stock Ownership Plan*,
   2009 WL 4823196 (N.D. Cal. Dec. 10, 2009)....................................................47

*Bannistor v. Ullman,*
287 F.3d 394 (5th Cir. 2002) ........................................................................47

*Barnes v. Am. Tobacco Co.,*
161 F.3d 127 (3d Cir. 1998) .........................................................................73

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan,*
447 F.3d 411 (5th Cir. 2006) ........................................................................50

*Brosted v. Unum Life Ins. Co. of Am.,*
421 F.3d 459 (7th Cir. 2005) ........................................................................62

*Browdy v. Hartford Life & Accident Ins. Co.,*
630 F.App'x 278 (5th Cir. 2015) ...................................................................62

*Brown v. Owens Corning Inv. Rev. Comm.,*
622 F.3d 564 (6th Cir. 2010) ........................................................................44

*Bus. Guides, Inc. v. Chromatic Commc'n Enters., Inc.,*
498 U.S. 533 (1991) ......................................................................................74

*Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC,*
91 F.4th 202 (4th Cir. 2024) .........................................................................67

*Chavez v. Plan Benefit Servs., Inc.,*
957 F.3d 542 (5th Cir. 2020) ........................................................................70

*Christianson v. Colt Indus. Operating Corp.,*
486 U.S. 800 (1988) ......................................................................................54

*Cooper Indus. v. Aviall Servs., Inc.,*
543 U.S. 157 (2004) ......................................................................................33

*Coulter v. Morgan Stanley & Co. Inc.,*
753 F.3d 361 (2d Cir. 2014) ....................................................................46, 48

*Dewberry Group, Inc. v. Dewberry Engineers Inc.,*
145 S.Ct. 681 (2025).....................................................................................51

vi

*Donelson v. Ameriprise Fin. Servs., Inc.,*
   999 F.3d 1080 (8th Cir. 2021) ................................................................74

*Duchardt v. Midland Nat'l Life Ins. Co.,*
   265 F.R.D. 436 (S.D. Iowa 2009) ..........................................................67

*Ehlmann v. Kaiser Found. Health Plan of Tex.,*
   198 F.3d 552 (5th Cir. 2000) .................................................................65

*Eni US Operating Co., Inc. v. Transocean Offshore Deepwater*
   *Drilling, Inc.,*
   919 F.3d 931 (5th Cir. 2019) .................................................................25

*FDA v. Alliance for Hippocratic Med.,*
   602 U.S. 367 (2024) ..............................................................30, 69, 73

*Forbush v. J.C. Penney Co.,*
   994 F.2d 1101 (5th Cir. 1993) ...........................................................68, 69

*In re Ford Motor Co.,*
   591 F.3d 406 (5th Cir. 2009) .................................................................54

*Hogan v. Kraft Foods,*
   969 F.2d 142 (5th Cir. 1992) ...........................................................38, 41

*Holmberg v. Armbrecht,*
   327 U.S. 392 (1946) ..............................................................................37

*Hozier v. Midwest Fasteners, Inc.,*
   908 F.2d 1155 (3d Cir. 1990) .................................................................49

*Hughes Aircraft Co. v. Jacobson,*
   525 U.S. 432 (1999) ..............................................................................60

*Hurlic v. S. Cal. Gas Co.,*
   539 F.3d 1024 (9th Cir. 2008) ...........................................................5, 60

*In re Behr Dayton Thermal Prods., LLC,*
   2017 WL 11690584 (S.D. Ohio Mar. 20, 2017) ....................................71

*Jamie S. v. Milwaukee Pub. Schs.*,
    668 F.3d 481 (7th Cir. 2012) ................................................................69, 74, 75

*John v. Nat'l Sec. Fire and Cas. Co.*,
    501 F.3d 443 (5th Cir. 2007) ...................................................................66

*Klaas v. Allstate Ins. Co.*,
    21 F.4th 759 (11th Cir. 2021) ...............................................................37, 43

*Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*,
    901 F.2d 404 (5th Cir. 1990) ................................................................46, 49

*Laskin v. Siegel*,
    728 F.3d 731 (7th Cir. 2013) ....................................................................41

*Lee v. Verizon Commc'ns, Inc.*,
    837 F.3d 523 (5th Cir. 2016) ................................................................27, 33

*Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v.*
    *GreenPoint Mortg. Funding, Inc.*,
    916 F.3d 116 (2d Cir. 2019) .....................................................................55

*Librizzi v. Children's Mem'l Med. Ctr.*,
    134 F.3d 1302 (7th Cir. 1998) ..................................................................37

*M.D. ex rel. Stukenberg v. Perry*,
    675 F.3d 832 (5th Cir. 2012) ....................................................................70

*Marcus & Millichap Real Est. Inv. Servs. of Nev., Inc. v. Triex Tex.*
    *Holdings, LLC*,
    659 S.W.3d 456 (Tex. 2023) ..........................................................38, 44, 45, 67

*Martinez v. Schlumberger, Ltd.*,
    338 F.3d 407 (5th Cir. 2003) ....................................................................65

*Matter of Complaint of Luhr Brothers, Inc.*,
    157 F.3d 333 (5th Cir. 1998) ....................................................................64

*Newby v. Enron Corp.*,
542 F.3d 463 (5th Cir. 2008) ................................................................25

*Ortiz v. Am. Airlines, Inc.*,
5 F.4th 622 (5th Cir. 2021) ..................................................................31

*Pearson v. Shriners Hosps. for Child., Inc.*,
133 F.4th 433 (5th Cir. 2025) ..............................................................25

*Pegram v. Herdich*,
530 U.S. 211 (2000) ......................................................................28, 45

*Peters v. Aetna Inc.*,
2 F.4th 199 (4th Cir. 2021) ..................................................................66

*Petrohawk Props., L.P. v. Chesapeake La., L.P.*,
689 F.3d 380 (5th Cir. 2012) ...............................................................25

*Radford v. Gen. Dynamics Corp.*,
151 F.3d 396 (5th Cir. 1998) ....................................................35, 36, 37

*Ranke v. Sanofi-Synthelabo Inc.*,
436 F.3d 197 (3d Cir. 2006) ................................................................41

*Retirement Plan of UNITE HERE National Retirement Fund v.*
*Kombassan Holding A.S.*,
629 F.3d 282 (2d Cir. 2010) ................................................................52

*Reule v. Jackson*,
114 F.4th 360 (5th Cir. 2024) ....................................................26, 29, 34

*SEC v. Stanford Int'l Bank, Ltd.*,
112 F.4th 284 (5th Cir. 2024) ..............................................................33

*Secretary, U.S. Dep't of Labor v. Preston*,
873 F.3d 877 (10th Cir. 2017) .............................................................37

*Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*,
543 F.3d 597 (10th Cir. 2008) .........................................................73, 75

*Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan*,
    883 F.2d 345 (5th Cir. 1989)..................................................................49

*Sprague v. Gen. Motors Corp.*,
    133 F.3d 388 (6th Cir. 1998)..................................................................61

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)..................................................................................33

*Stirman v. Exxon Corp.*,
    280 F.3d 554 (5th Cir. 2002)..................................................................25

*Swinney v. Gen. Motors Corp.*,
    46 F.3d 512 (6th Cir. 1995)..............................................................61, 63

*Tarrify Props., LLC v. Cuyahoga Cnty.*,
    37 F.4th 1101 (6th Cir. 2022)..................................................................66

*Thole v. U.S. Bank N.A*,
    590 U.S. 538 (2020)............................................................................26, 27

*Tiblier v. Dlabal*,
    743 F.3d 1004 (5th Cir. 2014)..................................................................46

*Tolbert v. RBC Cap. Mkts. Corp.*,
    2016 WL 3034497 (S.D. Tex. May 26, 2016) ........................................72

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)........................................................................*passim*

*Turner v. Liberty Mutual Retirement Benefit Plan*,
    2023 WL 5179194 (D. Mass. Aug. 11, 2023) ...............................32, 33, 34

*United States v. Bestfoods*,
    524 U.S. 51 (1998)..................................................................................50

*Varity v. Howe*,
    516 U.S. 489 (1996)................................................................................62

*Vercellino v. Optum Insight, Inc.*,
  26 F.4th 464 (8th Cir. 2022).............................................................................61

*Vickery v. ConAgra Foods, Inc.*,
  2015 WL 5306204 (E.D. Mo. Sept. 10, 2015).................................................46

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..................................................................................*passim*

*Walker v. Epps*,
  550 F.3d 407 (5th Cir. 2008).............................................................................38

**Statutes**

28 U.S.C. §1291.....................................................................................................3

28 U.S.C. §1331.....................................................................................................3

28 U.S.C. §1332(e)(1) ...........................................................................................3

29 U.S.C. §3(21)(A) ........................................................................................48, 49

29 U.S.C. §1002(21)(A) .......................................................................................49

29 U.S.C. §1022............................................................................................*passim*

29 U.S.C. §1024(b).................................................................................................39

29 U.S.C. §1054(h)........................................................................................*passim*

29 U.S.C. §1104............................................................................................*passim*

29 U.S.C. §1109(b).................................................................................................47

29 U.S.C. §1113............................................................................................*passim*

29 U.S.C. §1132(a)(1)(A) .......................................................................................14

29 U.S.C. §1132(a)(3) ..................................................................................*passim*

xii

**Rules**

Fed. R. Civ. P. 23.......................................................................................*passim*

Fed. R. Civ. P. 52(c) ..............................................................................18, 26

**Other Authorities**

7A Fed. Prac. & Proc. §1760 (4th ed.) ................................................68

**INTRODUCTION**

In 1989, BP America, Inc. converted its employee retirement plan from a "final-average-pay" plan to a "cash-balance" plan.  The new plan—the Retirement Accumulation Plan ("RAP")—replaced the old plan—the BP America Inc. Retirement Plan ("ARP")—and included a new formula for calculating a participant's benefit.  Throughout 1989, BP America, the then-plan sponsor, issued numerous communications to its employees informing them of the conversion, explaining the RAP's features, and illustrating how the new benefit would be calculated based on various inputs, including actual pay, service years, age at retirement, and prevailing interest rates.

The communications made clear that the RAP was designed to provide a retirement benefit "comparable to—and, in most cases, better than" the benefit participants would have received under the ARP, but also that "certain employees … could receive a lower benefit."  And while the communications explicitly guaranteed that participants age 50 years or older on January 1, 1989 would receive the higher of their ARP or RAP benefit, they made no such promise for other employees.  Following the conversion, employees received annual statements identifying their account balance and the interest rate to be applied in the coming year for calculating their benefit.

In 2011, certain employees began complaining that their RAP benefits were lower than what they expected based on the 1989 communications. The plan administrator investigated these claims and concluded that the employees received what they were promised and thus declined to enhance their benefit.  In 2016, some of those employees filed this suit, alleging that Defendants—the RAP and BP Corporation North America, Inc. ("BPCNA"), the plan's current sponsor—violated their fiduciary duty under ERISA because of the purportedly inadequate communications BP America made regarding the RAP in 1989.

Nearly a decade of litigation ensued.  Over Defendants' objection, the district court certified a class consisting of all RAP participants under age 50 as of January 1, 1989, whose ARP benefit exceeds the benefit they received or will receive under the RAP.  After a bench trial, the district court entered findings of fact and conclusions of law determining that Defendants had breached their fiduciary duty based on purportedly inadequate communications in 1989 by BP America.  It ordered the RAP reformed such that every RAP participant under age 50 as of January 1, 1989 would receive a benefit "equal to the greater of" his ARP or RAP benefit—precisely what the RAP had expressly limited only to those employees age 50 or older.

The district court's judgment is deeply flawed in numerous respects and cannot stand. First, Plaintiffs lack Article III standing because their claimed injury—a shortfall between their RAP benefit and ARP benefit—is not fairly traceable to the alleged breach of fiduciary duty—the purportedly inadequate 1989 communications. Second, Plaintiffs' suit is untimely because the purported wrongs took place in 1989, barring recovery under ERISA's statute of repose, which had run by Plaintiffs' 2016 suit. Third, liability against Defendants for breach of fiduciary duty is improper because Defendants were not fiduciaries with respect to the alleged wrongful acts, and, regardless, the district court's breach determination rests on numerous clearly erroneous findings. Finally, the certified class fails multiple requirements of Rule 23. The judgment should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. §§1331 and 1332(e)(1) because suit was brought under 29 U.S.C. §1132(a)(3). The district court entered judgment on November 12, 2024, and Defendants timely appealed on December 9, 2024. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF ISSUES

1. Whether Plaintiffs lack Article III standing.

2. Whether Plaintiffs' suit is untimely.

3. Whether Plaintiffs proved Defendants' liability for breach of fiduciary duty, where (i) Defendants were not fiduciaries with respect to the alleged wrongs, and (ii) the district court's fiduciary-breach determination rested on findings that violate the law-of-the-case doctrine and are clearly erroneous.

4. Whether the certified class fails Rule 23's requirements.

## STATEMENT OF THE CASE AND FACTS

### A.    BP America's Conversion of the ARP to the RAP

**1.** BP America was incorporated in 1974 to serve as the American presence for British Petroleum. ROA.13473. In 1989, when the events giving rise to this litigation began, BP America was a subsidiary of BP p.l.c., as it remains today. *Id.*

Before 1989, BP America sponsored the ARP, a final-average-pay defined-benefit pension plan. ROA.2002-03, 22227, 22311. The ARP resulted from merging the retirement plans of several acquired companies, including Sohio, which BP America had purchased in 1987. ROA.4055, 21733.

4

**2.** Effective January 1, 1989, BP America converted the ARP from a final-average-pay pension plan to a cash-balance pension plan and renamed it the RAP. ROA.2003-04, 22343. BP America remained the sponsor of the RAP, and the RAP remained a defined-benefit plan, rather than a defined-contribution plan. Thus, BP America remained solely responsible for funding the plan sufficiently to pay benefits, regardless of the underlying investments' performance. ROA.4181-82, 4201; *see generally Hurlic v. S. Cal. Gas Co.*, 539 F.3d 1024, 1029 (9th Cir. 2008) (describing defined-contribution and defined-benefit plans, including cash-balance plans).

The RAP replaced the ARP's benefit formula with a new formula. The RAP's formula includes an "opening account balance" and a "current account." ROA.22363. The opening account balance included the value of a participant's accrued retirement benefit (including as-yet-unearned early retirement subsidies) as of December 31, 1988. ROA.22359, 22364. The opening account grows through "regular interest" credit (the 12-month average of the one-year T-bill rate as of November 30 of the prior year, plus 1%) and "supplemental interest" (one-half the "regular interest" rate) while a participant remained employed. ROA.3966, 22364-65. The current account also grows through regular interest credits, as well as through "service

credits" based on a participant's compensation and age or service length. ROA.4081, 22363-64. The RAP guarantees at least 5% regular interest, with no ceiling. ROA.22364.

Unlike the ARP, the RAP allows participants to accrue greater benefits earlier in their career. The RAP also allows portability; a participant may take his fully-vested benefit as a lump sum if he leaves the company before retirement. The RAP further provides a pre-retirement death benefit equal to the participant's entire account balance, rather than the ARP's fractional benefit. And the RAP gives participants greater visibility into the accruing benefits, which are reported throughout their careers. *See, e.g.*, ROA.20457, 22058-59.

All ARP participants were moved to the RAP. The RAP explicitly "grandfathered" persons age 50 or older on January 1, 1989, meaning their benefit would be the greater of their ARP benefit or their RAP benefit. Participants under age 50 were not grandfathered. ROA.3970, 22365.

### B.    Communications Regarding the RAP

**1.** BP America engaged a leading actuarial firm, Kwasha Lipton ("Kwasha"), to assist in developing the RAP, modeling projected benefits, and drafting employee communications explaining the RAP. ROA.3952-53,

6

3963, 4055-58. Kwasha's models showed that, under the RAP's formula, any given employee could be expected to receive a future benefit equivalent to between 90% and 148% of his ARP benefit, depending on when he retired. ROA.4188-89, 21776. Kwasha's projections assumed an 8% annual interest rate for the "regular interest" credit described above—meaning, Kwasha assumed a one-year T-bill rate of 6.75-7%. ROA.19845-46. That rate was consistent with other contemporaneous actuarial projections and below the then-current T-bill rate. *Id.*

In summer 1989, BP America explained the RAP to employees through a series of communications central to this litigation. *First*, it distributed a letter from its then-CEO (the "Ross Letter") with an attached brochure (the "Short Brochure"). The Ross Letter stated that BP America was "about to implement a major overhaul of the BP America pension program." ROA.21037. It referred readers to "[t]he enclosed brochure highlight[ing] the principal changes" and to "more detailed information" to come. *Id.* The letter added that the RAP "preserve[s] the principal strengths of the former plan"—including that BP America "pays the full cost," "is responsible for funding," and "bears the full investment risk"—and the RAP provides a benefit "comparable to" the benefit under the ARP. *Id.* The Short Brochure

7

described the RAP formula, including the opening account balance, pay credits, and interest. ROA.22050-52. It explicitly stated that "[i]f you were at least 50 years old … as of January 1, 1989 … [y]ou will receive the *larger*" of the ARP or RAP benefit upon retirement. ROA.22052. No such promise was made to employees under 50.

*Second*, BP America distributed a 26-page booklet more fully explaining how the RAP worked (the "Long Brochure"). The Long Brochure noted some of the RAP's "highlights," including (i) "you earn benefits throughout your career, not just toward the end"; (ii) "[w]hen you retire or you leave … you can take the vested value of your account with you"; and (iii) "BP America pays the full cost." ROA.21040. It noted, "Your Plan account earns interest according to an annually determined rate" and explained how that rate was calculated. *Id.* And it added, "Interest rates will be announced before the start of each calendar year, so you'll always know in advance what the interest rate on your account will be for the coming year." ROA.21045.

The Long Brochure informed RAP participants: "The Plan is designed to provide a retirement benefit that is comparable to—and, in most cases, better than—the benefit you would have received under the prior pension

formula." ROA.21040. But it also advised that "certain employees … could receive a lower benefit than they would have under the prior benefit formula." ROA.21056. A formal presentation to participants in 1989, using a prepared script, reflected this same position. Participants were shown slides comparing two sample employees' benefits under the ARP formula and RAP formula depending on age, years of service, and pay at conversion, as well as retirement age. The comparisons showed, and participants were informed, that the RAP "provides larger benefits at *most* ages during a career." ROA.21921-23; *see also* ROA.21922 (chart projecting that 40-year-old participant with seven years of service and $50,000 current pay at conversion would, upon retirement at age 60, have lower benefit under RAP than ARP).

*Third*, BP America sent employees a letter explaining how their opening account balances had been calculated and projecting how their accounts might grow, assuming 8.5% interest and other inputs (the "Opening Account Balance Letter"). ROA.21220, 21411, 31007. The letter stated that the projections were for "illustrative purposes only" and "not a promise that … opening and current accounts will increase accordingly in the future." *Id.* The letter included a disclaimer that "your actual pay, your age at retirement, the Social Security wage base, the level of future interest

rates[,] and the payment option you select when you retire will determine your benefit." *Id.*

**2.** Starting in 1991, BP America issued Summary Plan Descriptions ("SPD") for the RAP explaining the benefit formula and showing the effect of interest rates and other variables on participants' benefits. ROA.4964-65, 25679. In subsequent years, BP America sent a letter annually to each participant identifying the interest rate to be applied in the coming year for calculating the regular interest credit. ROA.4080-81, 22044. BP America also sent account balance statements showing the regular interest credit rate. ROA.4080-81, 22044-46.

As early as 1992, due to macroeconomic conditions, the regular interest credit rate dropped below the 8% figure used in Kwasha's projections, and participants were so informed through these communications. ROA.21415-23. On occasion—like during and after the Great Recession beginning in 2008—macroeconomic conditions caused T-bill rates to plummet to unprecedented levels, including below the RAP's 5% floor. ROA.19854-55. Because of that floor, however, RAP participants continued to enjoy a minimum 5% regular interest credit rate, of which they were regularly informed. *Id.*

### C.    Plaintiffs' 2011 Concerns About the RAP

**1.** By 2001, the RAP's sponsor was no longer BP America but BPCNA, a different entity, which took over from BP America the annual issuance of the SPDs, interest rate letters, and account balance statements. ROA.23309, 24227. In July 2011, BPCNA enhanced the RAP benefit formulas for employees who formerly worked at some legacy companies (*e.g.*, Amoco), in order to retain workers with certain specialized skills. ROA.25040-49. Various employees who previously worked at Sohio—whose formulas were not changed—complained that their benefits were lower than their counterparts', requested similar enhancements (which BPCNA declined), and then asserted that their RAP benefits were less valuable than they should be. ROA.19957-58. Those employees included Frederic Guenther and Walton Fujimoto, Plaintiffs here.

For example, on June 28, 2011, Guenther—his union's longtime chief steward—wrote a BPCNA official that when the RAP was "rolled out," it was "presented to us as the best thing since peanut butter and jelly and that we would be much better off in the long run." ROA.21204. BPCNA investigated the employees' claim that "the communications used when the Sohio benefit was converted in 1989" from the ARP "did not accurately

11

project the future accrual under the" RAP.  ROA.21092.  On July 21, 2011, BPCNA informed the employees that they had been provided with the RAP benefit they were promised and declined to enhance their benefit.  *Id.*

**2.**   Undeterred, in October 2011, Guenther, Fujimoto, and other heritage Sohio employees filed concerns with the "Office of Ombudsman" ("OoO"), a program instituted in 2006 to allow employees to raise safety concerns.   ROA.4290-92, 4296.   Neither the OoO nor its agents were representatives of or could bind any BP entity; they could only start a discussion or negotiation process.  ROA.4294, 4302.

The OoO investigated the employees' concerns and issued a final report on March 7, 2014.  ROA.4305, 27932.  The OoO found that there were no "legal issues for reconsideration" and, reviewing the 1989 communications regarding the RAP, concluded that "there is no reason to believe that the BP benefits department personnel who were marketing the plan conversion did not believe their statements to be true, no matter how events played out."  ROA.27933, 27953.  The OoO did recommend that, as a matter of employee relations, BPCNA "try to rectify the SOHIO employees' heritage concerns."  ROA.27933.  BPCNA nevertheless declined to enhance

the RAP benefit, which it communicated to the employees on September 15, 2014.  ROA.21456-57.

Meanwhile, Plaintiffs were also raising their concerns in other outlets. Starting in 2012, Guenther continuously complained to BPCNA leadership that employees had been misled to believe they would receive a greater benefit under the RAP.  ROA.22207-13.  In February 2013, Guenther started a "Heritage Sohio Employees" Yahoo Group in which he stated, on February 11, 2013, that, in 1989, BP America had "made many misleading and incorrect statements" in "literature" and "meetings" regarding the conversion to the RAP.  ROA.21201–02, 29787.

At the same time, Guenther repeatedly informed others that multiple attorneys and Department of Labor counsel had told him that "the statute of limitations has run out" because, as early as "2010 or 2011," he and the employees had "found out" and "rais[ed] concerns" about their purported benefit shortfall.  ROA.29820.  Indeed, not one month before filing this suit, Guenther wrote a colleague that he and other employees "realiz[ed]" that they "were really shorted on the rap conversion" in "2011."  ROA.29802.

13

### D.    Proceedings Below

**1.** On April 13, 2016, Guenther and Fujimoto filed suit against the RAP and BPCNA, alleging four counts under ERISA §502(a)(3):  Defendants (i) "caused forfeitures and reductions in benefit accruals" by "appl[ying] an unlawful and unreasonable assumption" of an 8% interest rate; (ii) "failed to provide proper notice of reductions in the rate of future benefit accruals"; (iii) did not issue adequate SPDs; and (iv) provided inaccurate information regarding the RAP conversion.  ROA.86-94.  Plaintiffs also asserted, under ERISA §502(a)(1)(A), that Defendants had failed to provide them with requested documents.  ROA.94-95.  The district court (Harmon, J.) dismissed the first four counts because Plaintiffs' allegations were not "sufficient to confer Constitutional standing."  ROA.992.

Guenther and Fujimoto filed a First Amended Complaint ("FAC"). The FAC alleged three counts under §502(a)(3):  (i) Defendants "did not provide notice of reductions in the rate of future benefit accruals," contrary to §204(h); (ii) Defendants "did not provide a summary plan description," contrary to §102; and (iii) "[t]he plan should be reformed … to remedy BP's fiduciary breach."  ROA.1041-55.  The FAC also alleged, under §502(a)(1)(A), that Defendants "must produce the records requested."  ROA.1055-57.

14

The district court (Hanen, J.) again granted dismissal. As the court explained, the first two counts, alleging §§102 and 204(h) violations for insufficient notice and disclosures, "originate under §502(a)(3)," making them "subject to … the six-year statute of repose contained in" ERISA §413, 29 U.S.C. §1113. ROA.1897. But "Plaintiffs knew decades ago that they did not receive these notices/documents," so "these claims accrued in the 1988-90 time period" and "were barred over twenty years ago." *Id.* The court added that only the "Plan Administrator" can be liable for the alleged disclosure violations, but Plaintiffs had not identified whether either Defendant was a "Plan Administrator." ROA.1899. The court dismissed count four because it was "a request for production dressed up as a cause of action." ROA.1900. Finally, the court described count three as "a request for a remedy" and "not … a cause of action." ROA.1895. It ordered Plaintiffs "to replead Count Three, and only Count Three, in a manner that specifically states a recognized cause of action." ROA.1900-01. The court precluded Defendants from filing another motion to dismiss but invited "dispositive motions concerning that count" on summary judgment. ROA.1901.

On April 5, 2019, Guenther and Fujimoto filed a Second Amended Complaint ("SAC"). The SAC alleged a single count under §502(a)(3),

15

claiming that Defendants "breached their fiduciary duties under ERISA §404(a) by intentionally, recklessly or negligently representing to the Sohio heritage employees" that "[t]he RAP would provide a retirement benefit comparable to, or greater than, the retirement benefit provided by the ARP" and "[i]f the RAP did not yield a retirement benefit equal to, or greater than, the retirement benefit provided by the ARP, then BP would add to the … account to make the benefit comparable to what the employee would have received under the ARP."  ROA.1933-34.  Recycling the time-barred and previously dismissed §§102 and 204(h) claims, the SAC also alleged that Defendants' "failure to provide notice of the potential significant reduction in the future rate of benefit accrual … and failure to provide a SPD" constituted "breaches of fiduciary duty."  ROA.1934.  Plaintiffs requested "equitable reformation of" the RAP, specifically, "[a]n order reforming the RAP" such that it would "pay the difference … to … all class members who received less benefits or benefit accruals than the amount to which they are entitled."  ROA.1935-36.[1]

---

[1] In 2020, Plaintiff Les Owen was added.  ROA.21.

**2.** The case was reassigned to Judge Hanks. On March 31, 2021, adopting the magistrate judge's recommendation over Defendants' objections, the court certified a class consisting of all RAP participants under age 50 as of January 1, 1989, "whose retirement benefit under the [ARP] exceeds the retirement benefit offered (or that will be offered) by the [RAP]." ROA.11261. The court offered no reasoning to support its adoption of the magistrate judge's recommendation or rejection of Defendants' objections.

Defendants moved for summary judgment, arguing that Plaintiffs lacked standing, their claims were time-barred, and there was no breach of fiduciary duty. Following over 125 pages of briefing, the court denied summary judgment in a one-page order. ROA.11586. Without providing any reasoning, the court concluded that "genuine issues of material fact exist that must be resolved at trial." *Id.*

Defendants subsequently moved to dismiss for lack of standing, contending that Plaintiffs could not establish the requisite causal connection between the challenged conduct and their claimed harm. Following another 46 pages of briefing, the district court denied the motion without any reasoning, stating only that the motion was "denied without prejudice to being reasserted at trial." ROA.12873.

The court held a fourteen-day bench trial. After Plaintiffs rested, Defendants moved for judgment under Rule 52(c), contending, *inter alia*, that Plaintiffs' claim was time-barred, Defendants did not breach any fiduciary duties, and classwide resolution was infeasible. ROA.14287. The parties devoted 127 pages to briefing this motion—but the district court never ruled on it.

**3.** On March 28, 2024, the district court issued findings of fact and conclusions of law. ROA.17085. The court stated that the "primary issue is the sufficiency of the explanation of the conversion of" the ARP to the RAP in 1989. *Id.* In its factual findings, the court determined that Defendants "violated the ERISA notice and disclosure requirements" when converting the ARP to the RAP in 1989. ROA.17086. It further determined that "BP's communication campaign violated BP's fiduciary duty" under ERISA §404. ROA.17083. Despite noting that the 1989 communications told participants that the RAP was designed to provide a benefit "comparable to—and, in most cases, better than—the benefit" under the ARP, the court found— without citing any evidence—that "[t]he average participant understood a comparable retirement benefit was one that was at least equal to what they would have received under the" ARP. ROA.17081.

18

In its conclusions of law, the court again devoted several pages to concluding that Defendants violated ERISA's notice and disclosure requirements under §§102 and 204(h). ROA.17098-103. It also determined that Defendants "breached [their] duties" under ERISA §404(a) by "failing to provide complete and accurate written explanations of the benefits available to RAP participants" and "drawing specific comparisons to the benefits provided previously by the ARP." ROA.17106.

The court concluded that Plaintiffs' action "is timely." ROA.17111. It explained that "ERISA §502(a)(3) does not include a statute of limitations," and because §502(a)(3) "only allows for equitable relief," the "doctrine of laches, not statute of limitations," applies, which Defendants had not satisfied. ROA.17111-12. Last, the court rejected Defendants' contention that Plaintiffs cannot recover because the parties against whom Plaintiffs sought (and obtained) liability for breach of fiduciary duty, the RAP and BPCNA, were not fiduciaries at the time of the breach. ROA.17112. In the court's view, "[t]o conclude otherwise would subvert the traditional purposes of equity for the sake of pure corporate formalism." ROA.17113. As before, the court did not address standing.

The court subsequently ordered equitable relief. It ultimately reformed the RAP such that a participant under age 50 as of January 1, 1989, would receive a benefit "equal to the greater of" his ARP or RAP benefit— *i.e.*, precisely the same "grandfathering" that the RAP had expressly limited to participants age 50 or older. ROA.17200-01, 17296, 17408.

## SUMMARY OF ARGUMENT

**I.** Plaintiffs lack Article III standing. To establish constitutional standing, a plaintiff must prove that his injury is fairly traceable to the defendant's wrongful acts. Plaintiffs have not satisfied this requirement because their claimed injury—a shortfall between RAP and ARP benefit—is not fairly traceable to the conduct they allege violated Defendants' fiduciary duty—the purportedly inadequate communications regarding the RAP in 1989. The cause of any shortfalls between RAP and ARP benefits was BP America's conversion of the ARP to the RAP—which it could indisputably undertake—not any inadequate communications regarding the conversion. Had the communications been exactly as Plaintiffs preferred, Plaintiffs still would have received exactly the same benefit, defeating causation.

Plaintiffs' only attempt to surmount this fundamental defect was to allege that they would have sought other employment or pursued other

retirement strategies had they received different information in 1989. But that speculative theory is insufficient to establish Article III standing, Plaintiffs never proved that allegation at trial, and the district court never made any findings to support it regardless. Indeed, the district court repeatedly avoided the Article III standing issue, despite Defendants' repeated attempts to raise it, and no authority supports Plaintiffs' constitutional standing here.

**II.** Plaintiffs' suit is untimely. Plaintiffs brought a single claim under ERISA §502(a)(3) for violation of ERISA §404(a)'s fiduciary duty. This Court has squarely held that such a §502(a)(3) claim is subject to the statute of repose in ERISA §413, which provides that the repose period expires the earlier of six years after the violation or three years after the earliest date the plaintiff had actual knowledge of the violation. The district court's holding that only the doctrine of laches applies because Plaintiffs sought equitable relief conflicts with binding precedent.

Under §413, Plaintiffs' suit is time-barred. The alleged ERISA violations here occurred in 1989, so the six-year statute of repose ran in 1995, over twenty years before Plaintiffs' 2016 suit. The record is also replete with evidence of Plaintiffs' actual knowledge as early as 2011, reinforcing the

21

suit's untimeliness. While §413 contains an exception that, in cases of "fraud or concealment," the repose period runs six years after the date of discovery, the district court did not invoke this exception, and there is no basis for applying it regardless. "Fraud or concealment" requires affirmative steps to hide the violation, yet participants here received clear and accurate information regarding their benefits not only during the conversion but also for the following two decades. Those disclosures defeat any attempt to establish fraud or concealment because they evince no effort to hide any violation and allowed Plaintiffs to discover any alleged violation by exercising diligence.

**III.** The district court erred in determining that Defendants breached their fiduciary duty. At the outset, Defendants cannot be liable for breach of fiduciary duty because they were not fiduciaries with respect to the wrongs alleged. Plaintiffs argued, and the court concluded, that the purportedly inadequate communications in 1989 constituted the fiduciary breach. But Defendants were not fiduciaries with respect to that conduct: the Plan cannot be a fiduciary with respect to itself, and BPCNA did not even exist at the time. The fiduciary at the time was BP America, which Plaintiffs never named as a defendant — likely because it would highlight their statute-of-

repose problem. The district court's imposition of liability on Defendants by invoking the "traditional purpose of equity" and overriding "corporate formalism" ignores binding precedent and disregards longstanding principles supporting corporate separation absent extraordinary circumstances not present here.

Regardless, the evidence does not support breach of fiduciary duty by Defendants, and the district court's contrary determination was erroneous. First, the court contravened the law-of-the-case doctrine by premising its fiduciary-breach determination in part on finding that Defendants violated ERISA §§102 and 204(h), even though Judge Hanen dismissed those claims as untimely early in the litigation. Second, the court's fiduciary-breach determination rested on numerous clearly erroneous findings. For instance, the court found that the 1989 communications promised all ARP participants their RAP benefit would be "as good or better than" or "at least equal to" their ARP benefit. But not one communication made that promise, and participants were expressly told that some participants might receive a RAP benefit lower than their ARP benefit. The court also found that the communications falsely represented that the plan would "bear the full investment risk," but as the record and case law establish, that

23

representation is entirely accurate. Nor were there any other intentional misrepresentations regarding the RAP, as fiduciary breach requires and the evidence wholly disproves.

**IV.** The certified class fails the ascertainability, commonality, and classwide relief requirements of Rule 23. The court certified a class of participants under age 50 "whose retirement benefit under the [ARP] exceeds the retirement benefit offered (or that will be offered) by the [RAP]." This class fails the ascertainability requirement because extensive and individualized factfinding is necessary to determine who falls within it— and that inquiry is not even possible for numerous categories of employees. The class fails commonality because only individualized, not classwide, proof can answer whether any putative class member suffered injury and whether that injury was caused by the 1989 communications. And the class does not satisfy Rule 23(b)(2) for two reasons. First, that provision requires "injunctive relief or corresponding declaratory relief," but the district court imposed a different remedy, reformation. Second, the reformation does not benefit all class members at once, as 23(b)(2) mandates, but instead requires individualized inquiries to determine whether a class member may benefit.

24

**STANDARD OF REVIEW**

"After a bench trial, findings of fact are reviewed for clear error while conclusions of law and mixed questions of law and fact are reviewed de novo." *Eni US Operating Co., Inc. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931, 934 (5th Cir. 2019). "A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony." *Petrohawk Props., L.P. v. Chesapeake La., L.P.*, 689 F.3d 380, 388 (5th Cir. 2012). The Court reviews *de novo* "[q]uestions of law relating to constitutional standing," *Pearson v. Shriners Hosps. for Child., Inc.*, 133 F.4th 433, 441 (5th Cir. 2025), and the application of statutes of repose, *Newby v. Enron Corp.*, 542 F.3d 463, 468 (5th Cir. 2008). It reviews for abuse of discretion a district court's decision to certify a class. *Stirman v. Exxon Corp.*, 280 F.3d 554, 561 (5th Cir. 2002).

**ARGUMENT**

I. **Plaintiffs Lack Constitutional Standing.**

After the first judge dismissed this case for lack of Article III standing and Plaintiffs filed an amended complaint, Defendants repeatedly argued that Plaintiffs still lacked Article III standing—including in a motion for

25

summary judgment, a subsequent motion to dismiss, their pre-trial brief, their proposed conclusions of law, and a Rule 52(c) motion for judgment. Yet the district judge presiding over those motions and the trial just as repeatedly dodged the question, never providing any explanation for how Plaintiffs satisfied the "irreducible constitutional minimum" of Article III standing. *Reule v. Jackson*, 114 F.4th 360, 366 (5th Cir. 2024). In reality, Plaintiffs lack Article III standing because they cannot establish that their alleged injury-in-fact—a shortfall between the RAP benefit and ARP benefit—was caused by Defendants' purported violation—providing inadequate information regarding the RAP.

"There is no ERISA exception to Article III." *Thole v. U.S. Bank N.A*, 590 U.S. 538, 547 (2020). Like any other plaintiff in federal court, to establish constitutional standing, a plaintiff asserting an ERISA §502(a)(3) claim "must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Id.* at 540. The plaintiff bears the burden of establishing Article III standing "with the manner and degree of evidence required at the successive stages of the litigation," which means that, in a case that went to

26

trial, "the specific facts set forth by the plaintiff to support standing must be supported adequately by the evidence adduced at trial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

When evaluating standing, "an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law"—so-called statutory standing—"and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law"—*i.e.*, Article III standing. *Id.* at 426-27. A plaintiff must satisfy both types of standing, but "the cause of action does not affect the Article III standing analysis." *Thole*, 590 U.S. at 544; *see also Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 530 (5th Cir. 2016) ("We once again decline to conflate the concepts of statutory and constitutional standing by holding that incursion on a statutorily-conferred interest in proper plan management is sufficient in itself to establish Article III standing."). Under Article III standing, "[o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion*, 594 U.S. at 427.

Here, Plaintiffs lack Article III standing because they have not established that they suffered their alleged injury "because of [Defendants']

27

violation of federal law." *Id.* at 426-27. Plaintiffs' claimed injury is a shortfall between the RAP benefit and the ARP benefit they would have received absent conversion. *See* ROA.2683-84 (Plaintiffs describing their "injury" as "a retirement benefit that was not comparable to, and was less than, the retirement benefits they would have received under the [ARP]"); ROA.17296, 17408 (district court ordering plan reformation so each participant receives a benefit "equal to the greater of" his ARP or RAP benefit). The "violation of federal law" that Plaintiffs allege, however, is not the plan conversion; after all, it is entirely lawful to amend a plan, even if some participants receive lower benefits under the new plan. *See Pegram v. Herdich*, 530 U.S. 211, 225 (2000) (noting that plan sponsors "can … modify[] the terms of a plan … to provide less generous benefits"). Instead, the violation that Plaintiffs allege is a breach of fiduciary duty when BP America provided purportedly inadequate communications regarding the conversion in 1989. *See, e.g.*, Resps.' Answer in Opp. to Pet. for Interlocutory Appeal 13, *Guenther v. BP Retirement Accumulation Plan*, No. 21-90015 (5th Cir. Apr. 26, 2021) (Plaintiffs describing the "violations of ERISA" for which they "seek[] redress" as the 1989 "communications" that "omitted material

28

facts," "misled them regarding new risks," and "did not inform them that the project plan was not as good for certain employees").

But any shortfall between a RAP benefit and ARP benefit—the alleged injury—is not "fairly traceable" to BP America's purportedly improper disclosures—the alleged violation—as required for Article III standing. *Reule*, 114 F.4th at 366-67. Any such shortfall is "fairly traceable" to the conversion of the ARP to the RAP. Put differently, Plaintiffs' purported injury would have happened regardless of the disclosures made: Even if information regarding the RAP and its new benefit was formulated and conveyed to participants exactly as Plaintiffs would have preferred, BP America still would have implemented the RAP, and Plaintiffs still would have received a benefit determined under the RAP, including a benefit potentially lower than under the ARP. Plaintiffs have thus failed to show "a causal connection between the injury"—the alleged shortfall in RAP benefit compared to ARP benefit—"and the conduct complained of"—the inadequate communications by Defendants. *Id.*; *see also TransUnion*, 594 U.S. at 442 (holding that an "alleged information deficit" that "causes no adverse effects cannot satisfy Article III").

29

Plaintiffs' only attempt to surmount this fundamental Article III defect was to allege in the SAC that Defendants' inadequate communications "induced them to not seek suitable alternative employment to receive better retirement benefits" or not "alter[] their retirement strategies" to "address any shortfall caused by the plan amendment." ROA.1930. As an initial matter, that is an exceedingly slender reed on which to establish a causal connection. The Supreme Court has repeatedly explained that "the line of causation between the illegal conduct and injury … must not be too speculative or too attenuated." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024). To say the least, it is highly speculative that, if a plan participant was informed in 1989 that his RAP benefit might, many years in the future, be less than his ARP benefit because actual inputs unexpectedly turned out different from assumptions, the chance of that potential downside so outweighed the RAP's concrete and immediate benefits—like portability, more benefits accrued at an earlier age, and a higher death benefit—that the participant would have quit his job for entirely new employment elsewhere or altered his overall retirement strategy.

Perhaps for that reason—and underscoring the speculative nature of Plaintiffs' causal argument—Plaintiffs never proved these allegations with

30

"the evidence adduced at trial," even though they had the burden to do so to satisfy Article III standing. *TransUnion*, 594 U.S. at 431. For example, Plaintiffs never testified that they would have quit or engaged in a different retirement strategy had they received (in their view) more fulsome communications. Nor did any Plaintiff prove that he did not stay for other self-interested reasons, such as salary, paid time off, prestige, or accrual of seniority-related rights. To the contrary, the record indicates that any improved disclosures would have had no effect at all on Plaintiffs' future employment, future investing, or other plans. *See, e.g.*, ROA.18688 (Guenther admitting he did not "ever have an alternative offer of employment with any other company"); ROA.18255 (Owen admitting he never "interview[ed] for employment elsewhere"); *see also Ortiz v. Am. Airlines, Inc.*, 5 F.4th 622, 629 (5th Cir. 2021) (no Article III causation where plaintiffs offered no "declaration, affidavit, or testimony" that they would have acted differently "in a counterfactual world").

Notably, the first judge to oversee this case, Judge Harmon, *did* dismiss Plaintiffs' first complaint in full for lack of constitutional standing. And after the second judge, Judge Hanen, dismissed all but one of the FAC's claims and ordered Plaintiffs to replead the only remaining claim, Defendants

repeatedly argued to the third and final judge, Judge Hanks, that Plaintiffs still did not satisfy Article III standing, either in their SAC or afterward. Yet the court ignored the issue entirely in its summary judgment ruling, and it denied Defendants' subsequent motion to dismiss for lack of standing while noting only that it was "denied without prejudice to being reasserted at trial." ROA.12876.

Even when Defendants "reasserted" their constitutional standing argument at trial, however, the district court still did not address the issue in its findings of fact and conclusions of law—or so much as mention the word "standing." The closest the district court came to justifying its jurisdiction and addressing causation was a two-sentence paragraph regarding the appropriate remedy. The district court stated:

> BP's ERISA violations are appropriately redressed by equitable relief under Section 502(a)(3) of ERISA, 29 U.S.C. §1132(a)(3). Plaintiffs have 'show[n] by clear and convincing evidence that [BP] committed fraud or similarly inequitable conduct, and that such conduct caused [them] to be mistaken.' *Turner v. Liberty Mutual Retirement Benefit Plan*, No. 20-11530, 2023 WL 5179194, at *9 (D. Mass. Aug. 11, 2023); *see also Amara v. CIGNA Corp.*, 775 F.3d 510, 525-26 (2d Cir. 2014)."

ROA.17107.

To the extent the district court intended this passing reliance on *Turner* and *Amara* to justify constitutional standing, it erred. Apart from the fact that neither case is binding precedent in this Circuit, neither case mentioned, let alone considered, Article III standing—or, in particular, the causation requirement of Article III standing. Even the Supreme Court's decision in *Amara*, 563 U.S. 421 (2011), does not address Article III standing; rather, it "addresses only the requirement of 'detrimental reliance' as it relates to statutory standing," *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F.Supp.3d 1133, 1161 (N.D. Cal. 2022), *aff'd*, 137 F.4th 1015 (9th Cir. 2025), which as noted "is distinct from" Article III standing, *Lee*, 837 F.3d at 546; *see also TransUnion*, 594 U.S. at 426-27. The absence of any discussion of Article III standing in these cases defeats their use as constitutional-standing precedent. *See, e.g.*, *SEC v. Stanford Int'l Bank, Ltd.*, 112 F.4th 284, 293 (5th Cir. 2024) (noting that a court's "silence could never be construed as an implicit holding"); *Cooper Indus. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *cf. Steel Co. v. Citizens for a Better Env't*,

523 U.S. 83, 91 (1998) (explaining that "drive-by jurisdictional rulings … have no precedential effect").

Moreover, in *Amara*, the district court held that "only employees *whom [defendant's] disclosure failures had harmed* could obtain relief." 563 U.S. at 432 (emphasis added). The court thus prevented an Article III causation problem by restricting recovery to only those plaintiffs who could prove a causal connection between the defendant's disclosure failures and the claimed harm. By contrast, the district court here imposed no such limitation, and Plaintiffs were unable to prove any such causal connection at trial regardless. Similarly, in *Turner*, the plaintiff submitted an affidavit explaining that he "relied on [certain plan] misrepresentations to his detriment" by "turn[ing] down opportunities to explore working with other employers." *Turner*, 2023 WL 5179194, at *1-2. Plaintiffs here proffered no such evidence, and the record suggests the opposite.

In short, Plaintiffs have failed to satisfy the "irreducible constitutional minimum" of Article III standing. *Reule*, 114 F.4th at 366. For that reason alone, the judgment should be reversed.

## II.    Plaintiffs' Suit Is Untimely.

The district court also erred when, in deeming Plaintiffs' suit timely, it held that an ERISA breach-of-fiduciary-duty claim is not subject to any statute of limitations.  That determination ignores this Court's decision in *Radford v. Gen. Dynamics Corp.*, 151 F.3d 396 (5th Cir. 1998), that a suit under ERISA §502(a)(3) claiming a breach of fiduciary duty under §404(a)—*i.e.*, this exact case—is subject to §413's statute of repose.  *Id.* at 399.  And as Plaintiffs themselves have repeatedly acknowledged, the statute of repose here ran years ago, barring this suit.

### A.    Plaintiffs' Claim Is Subject to §413's Statute of Repose.

Plaintiffs alleged that "Defendants breached their fiduciary duties under ERISA §404(a) by intentionally, recklessly or negligently making … materially false and misleading statements and committing … omissions" related to the 1989 RAP disclosures.  ROA.1933.  Plaintiffs sought equitable relief "[p]ursuant to ERISA §502(a)(3), … to redress the Defendants' breach of fiduciary duty" under §404(a).  ROA.1934-35.  The district court subsequently found that "[i]n providing inaccurate and incomplete explanations of benefits and information about the RAP conversion and

35

drawing specific comparisons to the benefits provided previously by the ARP, BP breached its duties under ERISA §404(a)."  ROA.17106.

In *Radford*, this Court held that in these exact circumstances—a §502(a)(3) claim alleging breach of fiduciary duty under §404(a)—the statute of repose in §413 applies.  Section 413 states:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
>
> > (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
> >
> > (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. §1113.  *Radford* explained that the "plain language" of this provision indicates that it "would apply" to suits "for individualized equitable relief for breach of fiduciary obligations" brought "pursuant to §502(a)(3)."  151 F.3d at 398-99.  The provision applies to breaches "under

this part," and "[b]oth §413 and §404(a)," which imposes fiduciary duties, "are contained in Subchapter I, subtitle B, Part 4 of ERISA." *Id.* Numerous other courts of appeals have held the same. *See, e.g.*, *Klaas v. Allstate Ins. Co.*, 21 F.4th 759, 773 (11th Cir. 2021); *Librizzi v. Children's Mem'l Med. Ctr.*, 134 F.3d 1302, 1305 (7th Cir. 1998).[2]

The district court's contrary determination is erroneous. Ignoring *Radford* completely (although Defendants pressed it), the district court reasoned that §502(a)(3) permits only equitable relief, and equitable actions are not subject to statutes of limitations, only the doctrine of laches. But that principle applies only when, unlike here, a statute does not provide a limitations period. "If Congress explicitly puts a limit upon the time for enforcing a right which it created," that is the "end of the matter," for "[t]he Congressional statute of limitation is definitive." *Holmberg v. Armbrecht*, 327 U.S. 392, 395 (1946). That is exactly the situation here: Congress created a right under §502(a)(3) to "obtain … equitable relief" for, *inter alia*, breach of

---

[2] Although *Radford* occasionally used the phrase "statute of limitations," it made clear that §413 "is a statute of repose." 151 F.3d at 400; *see also Secretary, U.S. Dep't of Labor v. Preston*, 873 F.3d 877, 883 (10th Cir. 2017) (explaining that §413 is "a statute of repose, and not a mere statute of limitations").

the fiduciary duty established by §404(a), and §413 explicitly places a limit on actions "with respect to a fiduciary's breach of any … duty." None of the district court's cited authorities holds otherwise. To the contrary, the court's principal case, *Walker v. Epps*, *applied* a statute of limitations to a request for equitable relief. 550 F.3d 407, 412 (5th Cir. 2008).

Even if §413 did not apply, the laches doctrine still would not be relevant. Where ERISA does not supply a statute of limitations for a particular claim, courts "apply the state statute of limitations most analogous to the cause of action raised." *Hogan v. Kraft Foods*, 969 F.2d 142, 145 (5th Cir. 1992). Under Texas law, "actions for breach of fiduciary duty are governed by a four-year statute of limitations." *Marcus & Millichap Real Est. Inv. Servs. of Nev., Inc. v. Triex Tex. Holdings, LLC*, 659 S.W.3d 456, 461 (Tex. 2023). In every respect, therefore, the district court's application of the laches doctrine is mistaken.

## B.    Plaintiffs' Claim Is Time-Barred Under §413.

Once the district court's error is corrected and §413 is held to apply to Plaintiffs' claim, the timeliness question is simple. Section 413 provides that the statute of repose runs "the earlier of": (i) six years after the violation or, in the case of an omission, the date on which the fiduciary could have cured

38

the violation; or (ii) three years after the earliest date on which the plaintiff had "actual knowledge" of the violation.  29 U.S.C. §1113.

The district court repeatedly determined that Defendants' violation of ERISA occurred in 1989.  *See, e.g.*, ROA.17082-83 (finding that "[n]either BP nor the Plan Administrator complied with the 1989 requirements of ERISA §102(a)" or "ERISA §104(b)"); ROA.17099, 17102-03, 17105-06 (listing "BP's failure[s] … regarding the 1989 plan amendment and restatement" that were "violation[s]  of  ERISA").    ROA.17102  (stating  that  "BP's  written communications to participants of the Plan in the summer of 1989 did not satisfy" ERISA).  That date is also consistent with Plaintiffs' theory of liability, which contends that BP America's communications in 1989 caused their injury by failing to adequately inform them of the purported risks and disadvantages of the RAP.  Consequently, the six-year repose period had run by 1995—twenty-one years before Plaintiffs filed suit.[3]

The record is also replete with evidence of "actual knowledge" as early as 2011, more than three years before this 2016 suit.  For example, Guenther

---

[3] Tellingly, before filing suit, Guenther repeatedly informed others that multiple attorneys, including Department of Labor attorneys, told him that "the statute of limitations has run out."  ROA.22207.

complained to an official on June 28, 2011, that when the RAP was "rolled out," employees were falsely told that "we would be much better off in the long run." BP America investigated the claim that "the communications used when the Sohio benefit was converted in 1989 did not accurately project the future accrual under the" RAP, and informed employees on July 21, 2011, that employees received the benefit they had been promised and would not receive a higher benefit. Later in 2011, moreover, Plaintiffs raised the same concerns about their RAP benefits with the OoO. *See* pp.11-12, *supra*. Because the statute of repose runs the "earlier" of six years after the violation or three years after actual knowledge, 29 U.S.C. §1113, this evidence is unnecessary to establishing this suit's untimeliness, but it reinforces that the suit is plainly time-barred.

Plaintiffs cannot take refuge in §413's exception that "in the case of fraud or concealment," an action "may be commenced not later than six years after the date of discovery of such breach or violation." 29 U.S.C. §1113. The district court never determined that provision applied here, and it made no findings that would support its application—likely because it did not believe it needed to consider any statute of limitations at all. Indeed, across the court's 57-page opinion, the word "conceal" appears three times,

and the word "fraud" once.  *See* ROA.17097-098, 17107-08.  The court made no effort to link those passing references to §413's exception.

The record would not support such a finding in any event.  To satisfy the §413 exception, "a party must show that the alleged wrongdoer had both actual knowledge that a wrong had occurred and a fixed purpose to conceal the wrong from the injured party."  *Hogan*, 969 F.2d at 145.  "[A] finding of concealment requires evidence that a defendant took affirmative steps to hide the violation itself."  *Laskin v. Siegel*, 728 F.3d 731, 735 (7th Cir. 2013); *accord Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 204 (3d Cir. 2006). "[C]oncealment by mere silence" without a "positive act[]" is insufficient. *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*, 99 F.4th 928, 942 (7th Cir. 2024).  And as "[e]very circuit to consider the issue has ruled," the six-year period under the "fraud or concealment" exception "begins to run when the plaintiff should have discovered the alleged breach by exercising diligence."  *AGI Consulting L.L.C. v. Am. Nat'l Ins. Co.*, 798 F.App'x 296, 300 n.3 (10th Cir. 2020) (citing cases).

The district court made no findings satisfying these requirements for the "fraud or concealment" exception to apply, nor could it have.  The court's *only* factual finding referencing concealment was the court's statement that

41

"BP concealed all along it had no intent to fulfill its promise by enhancing the class members' benefits to be as good or better than what the class would have received under the ARP." ROA.17097-98. As a threshold matter, this finding rests on a clearly erroneous premise—that BP America made a "promise" that all RAP participants' benefits would "be as good or better than what [they] would have received under the ARP." As more fully set forth below, there is *no* evidence that BP America ever guaranteed "as good or better" benefits under the RAP than the ARP to all participants. Instead, BP America represented that participants would receive a RAP benefit "that is comparable to—and, in most cases, better than—the benefit" received under ARP, and it guaranteed "as good or better" benefits only to persons age 50 or older on January 1, 1989. *See* pp.56-69, *infra*.

But even accepting *arguendo* that erroneous finding, there was no evidence of any affirmative acts of concealment that would have prevented participants from learning there was no guarantee for those under age 50 on January 1, 1989 that their RAP benefit would exceed their ARP benefit. To the contrary, in 1991, BP America issued an SPD that provided an example of "How Your Benefit Grows" with the clear disclaimer: "Keep in mind, this example is based on certain assumptions about the future. Your actual

42

account balance will depend on actual changes in interest rates, the Social Security wage base and your eligible compensation." ROA.21155. From 1991 onward, moreover, all participants received annual RAP account statements showing their account balances and the interest rates used in determining pension accruals each year. *See, e.g.*, ROA.21223, 21415-27, 22090-96. Even Plaintiffs' expert acknowledged that, outside of the grandfathered population, no document issued from 1991 onward made any reference to comparing benefits to the ARP when determining benefits under the RAP—the message the district court found to have violated §404(a). ROA.17102-03, 17106, 19549-51.

Accordingly, far from taking "affirmative steps to hide the violation," BP America (and, later, BPCNA) for two decades provided clear and accurate information. Furthermore, those post-1989 disclosures—which Plaintiffs have never claimed were false or misleading—allowed Plaintiffs to "discover[] the alleged breach by exercising diligence," *AGI Consulting*, 798 F.App'x at 300 n.3. Those indisputably accurate disclosures thus defeat any attempt to extend the statute of repose through §413's "fraud or concealment" exception—a determination, it bears repeating, the district court never made. *See, e.g.*, *Klaas*, 21 F.4th at 773 (subsequent clear SPD

prevented application of exception); *Adams v. Brink's Co.*, 420 F.Supp.2d 523, 554 (W.D. Va. 2006), *aff'd*, 261 F.App'x 583 (4th Cir. 2008) (similar).

Nor can Plaintiffs point to the subsequent OoO process to invoke the exception, notwithstanding the district court's oblique gesture in that direction. *See* ROA.17097-98 (stating that "BP never intended to follow the Ombudsman's recommendation"). Apart from the fact that Defendants did not take "affirmative steps to hide the violation itself" during that process (which found *no* legal violation), a plaintiff cannot invoke §413's exception to resurrect an already untimely claim, such as where he is "already on actual notice of the alleged wrongdoing," as was the case by the time the OoO process began in October 2011. *Brown v. Owens Corning Inv. Rev. Comm.*, 622 F.3d 564, 574 (6th Cir. 2010). Put differently, Defendants "could not have engaged in fraud to conceal from the Plaintiffs what the Plaintiffs already knew." *Id.* By any measure, therefore, §413's statute of repose bars this suit.[4]

---

[4] The suit is also barred under Texas's four-year limitations period. In Texas, "a claim accrues when the defendant's wrongful conduct causes the claimant to suffer a legal injury … even if the fact of injury is not discovered until later." *Marcus & Millichap*, 659 S.W.3d at 461. While Texas has a discovery rule, that "narrow exception" only defers accrual "until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving

44

III. **The District Court Erred In Determining That Defendants Breached Their Fiduciary Duty.**

The district court erred for two independent reasons in determining that Defendants breached their fiduciary duty. First, it erred in concluding that entities who were not fiduciaries with respect to the challenged conduct could be liable for breach of fiduciary duty. Second, its determination of a fiduciary-duty breach rested on numerous clearly erroneous findings.

A. **Defendants Cannot Be Liable for Breach of Fiduciary Duty Because They Were Not Fiduciaries With Respect to the Wrongs Alleged.**

The district court first erred by imposing fiduciary-duty liability against entities who were not fiduciaries regarding the challenged conduct. "In every case charging breach of ERISA fiduciary duty," the "threshold question" is whether the defendant "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram*, 530 U.S. at 226. To answer this question, a court must determine whether the defendant possessed or exercised "actual fiduciary

---

rise to the cause of action." *Id.* Because Plaintiffs "suffer[ed] a legal injury" in 1989, "knew" of the facts giving rise to their claim by 2011, and "exercising reasonable diligence, should have known" of those facts any time between 1991 and 2011, the four-year period ran before April 13, 2016.

45

authority ... with respect to the wrongs alleged." *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 901 F.2d 404, 418 (5th Cir. 1990). If a named defendant did not "act[] as a fiduciary with regard to the specific transaction about which [plaintiffs] complain," a breach-of-fiduciary-duty claim against that defendant must fail. *Tiblier v. Dlabal*, 743 F.3d 1004, 1008-10 (5th Cir. 2014); *see also Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 366-67 (2d Cir. 2014) (affirming dismissal of ERISA fiduciary-duty claim because defendants were not fiduciaries with respect to challenged conduct).

As explained above, the "wrongs alleged" in this case are the purportedly inadequate communications to ARP participants in 1989 regarding the plan conversion and the new RAP benefit, which the district court found to constitute the breach of fiduciary duty. *See* pp.18-19, 28-29, 39-40, *supra*. But it is undisputed that neither of the Defendants here—the Plan or BPCNA—"act[ed] as a fiduciary" with respect to those communications. Indeed, neither of them *could* have. As for the Plan, courts have made clear that "[a] plan covered by ERISA cannot, as an entity, act as a fiduciary with respect to its own assets." *Acosta v. Pac. Enters.*, 950 F.2d 611, 618 (9th Cir. 1991), *as amended on reh'g* (Jan. 23, 1992); *see also Vickery v. ConAgra Foods, Inc.*, 2015 WL 5306204, at *4 (E.D. Mo. Sept. 10, 2015)

46

(dismissing breach-of-fiduciary-duty claim under §502(a)(3) as to plan defendant); *accord Balsley v. Delta Star Emp. Stock Ownership Plan*, 2009 WL 4823196, at *3 (N.D. Cal. Dec. 10, 2009).

As for BPCNA, it could not have acted as a fiduciary with respect to the 1989 communications because it did not even exist then. *See* ROA.3762-63 (BPCNA "was created in 2001" and "did not exist during 1989 to 1991"). ERISA provides that "[n]o fiduciary shall be liable with respect to a breach of fiduciary duty" when "such breach was committed before [it] became a fiduciary." 29 U.S.C. §1109(b). That rule is illustrated in *Bannistor v. Ullman*, 287 F.3d 394 (5th Cir. 2002), where this Court held that current plan fiduciaries could not be liable for failing to modify loan terms where they "had no such power" and "assumed their duties long after the loan was implemented." *Id.* at 397, 405. *A fortiori*, BPCNA cannot be liable for a fiduciary breach when it did not even exist, let alone have fiduciary authority, at the time of the alleged conduct.

Rather than the Plan or BPCNA, the undisputed evidence at trial confirmed that "wrongs alleged," *i.e.*, the purportedly inadequate 1989 communications, were undertaken by *BP America*, then the plan sponsor and a *de facto* fiduciary. *See* ROA.22348 (defining the "Company" as BP America

47

Inc.); ROA.18380 (Plaintiff Fujimoto acknowledging RAP statements came from BP America); ROA.22082 (Long Brochure encouraging employees to "spend your full career with BP America"); ROA.21037, 21172, 22047, 22064, (1989 communications showing only BP America's name or insignia). And the only named fiduciary for the RAP was BP America's Vice President of Human Resources. *See* ROA.22348, 22353. *See Coulter*, 753 F.3d at 366 (explaining that persons can be either "a *de facto* fiduciary," by qualifying under the statutory definition, or "a named fiduciary"). But Plaintiffs did not allege breach of fiduciary duty by either BP America (which still exists) or any BP America official.

To circumvent this problem, Plaintiffs and the district court frequently glossed over the distinctions between BP-affiliated corporate entities by utilizing the generic, undefined catchall "BP." *See* ROA.13866, 17082 (Plaintiffs proposing, and court finding, that "BP was acting as a fiduciary during the 1989 communications campaign."); ROA.13866, 17083 (Plaintiffs proposing, and court finding, that "BP's communication campaign violated BP's fiduciary duty"). But the generic "BP" was not a fiduciary in 1989; *BP America* was. And when it comes to imposing liability for breach of fiduciary duty, precision matters. ERISA §3(21)(A) provides that "a person is a

fiduciary" only "to the extent" it "exercises" certain discretionary authority, control, or responsibility regarding plan management or administration or asset disposition. 29 U.S.C. §1002(21)(A). "The phrase 'to the extent'" in §3(21)(A) establishes "the notion of limited fiduciary responsibility," meaning "a person is a fiduciary only with respect to those aspects of the plan over which he exercises authority or control." *Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan*, 883 F.2d 345, 352 (5th Cir. 1989). ERISA's limited, functional definition of "fiduciary" demands that a court "determine precisely the extent" of "*actual* fiduciary authority *possessed or exercised* by" a specific entity "with respect to the wrongs alleged by [the plaintiff]." *Landry*, 901 F.2d at 418; *see also Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir. 1990) ("Fiduciary duties under ERISA attach not just to particular persons, but to particular persons performing particular functions."). The "actual fiduciary authority" possessed or exercised here regarding the purportedly wrongful acts was by BP America—not Defendants BPCNA or the Plan (or "BP" generically).

The district court's determination that Defendants can nonetheless be liable for breach of fiduciary duty relied on rationales Plaintiffs did not advance and is plainly incorrect. Invoking the "traditional purpose of equity

49

… to redress wrongful conduct causing harm that would otherwise be uncompensated," the court saw "no reason" why ERISA liability could not be imposed on "a BP entity that is currently serving as plan sponsor for the actions of another BP entity that formerly served as plan sponsor." ROA.17113. But as noted above, there are plenty of "reason[s]" for not imposing ERISA liability in such circumstances — including well-established law prohibiting imposition of fiduciary-duty liability on an entity that was not a fiduciary with respect to the challenged conduct.

The district court derided the existence of different BP entities as "pure corporate formalism" that "equity" could ignore. *Id.* But the doctrine of corporate separateness "is a general principle of corporate law deeply ingrained in our economic and legal systems." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998); *see also Agency for Int'l Dev't v. Alliance for Open Society Int'l Inc.*, 591 U.S. 430, 435 (2020) ("It is long settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct legal rights and obligations."). To be sure, equity can sometimes allow disregard of the corporate form, but only in "exceptional" situations warranting application of veil-piercing or alter-ego remedies. *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006).

The district court did not even purport to apply those doctrines here, nor is there any evidence that would remotely support them. *See Dewberry Group, Inc. v. Dewberry Engineers Inc.*, 145 S.Ct. 681, 686-87 (2025) (reaffirming the "demand to respect corporate formalities" and reversing decision treating entity and its affiliates "as a single corporate entity").

The only authority the district court cited for its novel reasoning was the Second Circuit's decision in *Amara*. That case is easily distinguishable, however. There, the defendant argued it could not be liable because it was acting as plan administrator, not plan sponsor, during the challenged conduct. The Second Circuit held that "to deny reformation solely due to the general distinction between sponsor and administrator in ERISA would be inequitable in the circumstances here." 775 F.3d at 527. The case thus involved a *single* entity that unquestionably *was* a fiduciary with respect to the challenged conduct, and the only question was whether the sponsor/administrator distinction precluded relief. That is a far cry from the circumstances here, where the district court imposed fiduciary-duty liability on entities that were *not* fiduciaries with respect to the challenged conduct—one of which was not even in existence at the time—simply because of their corporate affiliation with still another entity.

The district court specifically quoted a statement in *Amara* that "the entity on which liability is imposed … need not in all circumstances be the exact same entity committing the acts leading to liability."  ROA.17112-13 (quoting 775 F.3d at 528 n.15).  As an initial matter, this statement is a tacit admission that, typically, the "entity on which liability is imposed" *is* "the exact same entity committing the acts leading to liability," which defeats liability for Defendants here.  Regardless, *Amara* was addressing a different case, *Retirement Plan of UNITE HERE National Retirement Fund v. Kombassan Holding A.S.*, 629 F.3d 282 (2d Cir. 2010), that is also inapposite.  First, *Kombassan* was not even a fiduciary-duty case.  Second, it imposed liability on a different entity by operation of the "alter ago" doctrine.  *Id.* at 528; *see Amara*, 775 F.3d at 528.  *Amara*'s statement that liability "need not" be imposed on "the exact same entity committing the acts" is thus a recognition that, in extraordinary cases warranting alter-ego or veil-piercing, an entity other than the actual fiduciary can be held liable for fiduciary-duty breach.  As noted, however, Plaintiffs never alleged, and the district court never found (nor could it have found), that such an exceptional circumstance exists here.

52

Finally, to uphold liability against Defendants for the "purpose of equity" ignores that Plaintiffs had fair notice and full opportunity through more than seven years of litigation to amend their Complaint and add a new defendant. In multiple motions to dismiss, Defendants argued that they could not be held liable for fiduciary-duty breach because they were not fiduciaries regarding the challenged conduct. *See* ROA.238-40, 1183-85. Plaintiffs were also given two opportunities to amend their complaint. And early on, Judge Hanen warned Plaintiffs that they might be suing parties who could not be liable under Plaintiffs' theory. *See* ROA.1899. But rather than simply remedy the defect—likely because naming BP America, the 1989 plan sponsor, would have highlighted Plaintiffs' statute-of-repose problem—Plaintiffs insisted that they need only name the Plan and BPCNA as Defendants. *See* ROA.505-09, 1608-13, 11003-04. It is not "inequitable" to require Plaintiffs to accept the outcome of their deliberate litigation choices. *See, e.g.*, *Agenbroad v. McEntire*, 595 F.App'x 383, 390 (5th Cir. 2014). This Court should reject the district court's unsupported invocation of "equity" to sidestep binding authority establishing that Defendants cannot be liable for breaches of fiduciary duty when they were not fiduciaries with respect to the challenged conduct.

**B.    The District Court's Fiduciary-Breach Determination Rested on Findings that Violate the Law-of-the-Case Doctrine and Are Clearly Erroneous.**

Even if Defendants could be held liable for fiduciary-duty breach, the district court erred in concluding that Defendants breached their fiduciary duties because (i) it improperly relied on previously dismissed claims, and (ii) its fiduciary-breach determination rested on clearly erroneous findings.

**1.    *The District Court Contravened the Law-of-the-Case Doctrine.***

At the outset, the district court improperly permitted Plaintiffs to establish an ERISA §404(a) violation based on violations of §§102 and 204(h)'s disclosure requirements even though Judge Hanen originally dismissed the very same §§102 and 204(h) disclosure claims as untimely. ROA.17082-83, 17098-103.  Judge Hanen specifically found that even when "giv[ing] Plaintiffs the most generous calendar, th[o]se claims accrued in the 1988-90 time period" and "were barred over twenty years ago."  ROA.1897. Under the "law of the case" doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case," absent "extraordinary circumstances."  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-17 (1988); *In re Ford Motor Co.*,

54

591 F.3d 406, 411-12 (5th Cir. 2009). Judge Hanen's determination that Plaintiffs' disclosure claims were untimely was law of the case and should have remained controlling.

The district court nevertheless held—without even addressing the prior dismissal order, much less finding "extraordinary circumstances" that warranted ignoring it—that Defendants violated §§102 and 204(h), and thus §404(a), by failing to provide plan participants "an ERISA §204(h) notice prior to January 1, 1989" and "an SPD [or SMM] regarding the 1989 plan amendment and restatement." ROA.17099, 17102. Plaintiffs cannot circumvent Judge Hanen's earlier ruling by repackaging their untimely and dismissed notice and disclosure claims as a fiduciary-breach claim. *See Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 127 (2d Cir. 2019) (rejecting plaintiff's effort to "circumvent the statute of limitations by recasting its contract claim as one for indemnification"). The district court's reliance on those purported violations to find a breach of fiduciary duty was erroneous.

55

## 2. *The District Court's Determination Rests on Clearly Erroneous Findings.*

The district court's determination that Defendants breached their fiduciary duty is independently erroneous because it rests on numerous findings that are clearly erroneous.

### a. The district court clearly erred in finding that the 1989 communications promised all participants a RAP benefit "as good or better than" or "at least equal to" the ARP benefit.

The district court repeatedly found that the 1989 communications "concealed the true nature" of the RAP by "promis[ing]" that benefits under the RAP would "be *as good or better than* what the class would have received under the ARP." ROA.17082-83, 17097, 17107-08 (emphasis added). Similarly, the court found that "[t]he average participant understood a comparable retirement benefit was one that was *at least equal to* what they would have received under the prior benefit formula." ROA.17081 (emphasis added). These findings—critical to the district court's fiduciary-breach determination—lack any support in the record.

BP America *never* communicated that all RAP participants would receive a benefit "as good or better than," or "at least equal to," their ARP benefit. To the contrary, the 1989 communications consistently conveyed

56

that the RAP was designed to produce benefits comparable to, and in most cases better than, the old formula—an entirely accurate statement.  The Ross Letter distributed to participants plainly stated that the RAP "provides a retirement benefit to career employees that is *comparable to* the fully competitive benefit under the prior formula."  ROA.21037.  The Long Brochure similarly represented that "[t]he Plan is designed to provide a retirement benefit that is *comparable to*—and, in *most* cases, better than—the benefit you would have received under the prior pension formula." ROA.21040.

The 1989 communications made clear that some employees might receive a *lower* benefit under the ARP than under the RAP.  The Long Brochure provided that "certain employees—particularly those in mid-career with shorter periods of service—could receive a lower benefit than they would have under the prior benefit formula."  ROA.21056.  BP's slide presentation informed employees that the RAP "provides larger benefits at *most* ages during a career" and provided an example of an employee who, depending on age, service years, and pay inputs, would receive a lower benefit under the RAP than the ARP upon retirement.  *See* ROA.21921-23 (emphasis added).    And    the    RAP    explicitly    and    automatically

"grandfathered" participants who were age 50 or older as of January 1, 1989, meaning they would receive the greater of their ARP or RAP benefit. ROA.22365.   No such promise was made to participants under 50, necessarily implying that those participants were not guaranteed a benefit "as good or better than" their ARP benefit.

Furthermore, the 1989 communications expressly identified the variables that would affect benefits received under the new formula.  The Long Brochure and slides from BP America's presentations disclosed the RAP benefit's inputs and explained that they would change over time, affecting potential benefits.  ROA.21044, 21192-93.  The Opening Account Balance Letters likewise advised that benefits under the RAP would vary based on numerous factors, including the individual's actual pay, age at retirement, Social Security wage base, level of future interest rates, and payment option selected at retirement.  ROA.21220, 21411, 31007.  And they advised that individual plan projections were "for illustrative purposes only" and "not a promise that [participants'] opening and current accounts w[ould] increase accordingly in the future."  ROA.21220, 21411, 31007.

In short, *nowhere* did these communications—or *any* communication— promise participants that their RAP benefit would be "as good or better" or

"at least equal to" their ARP benefit in all cases. Nor could any Plaintiff identify a single communication making such promises. *See* ROA.18363-64 (Fujimoto testifying that Ross Letter does not say RAP benefits will be "as good or better" than ARP benefits); ROA.18233 (Owen testifying that Long Brochure does not say benefits would be "equal" to ARP); ROA.18741-49, 18751-58 (Guenther identifying no untrue statements in Long Brochure).

The district court's findings appear to have been based on the OoO Report issued *in 2014*, over two decades *after* the 1989 communications. *See* ROA.17087-98, 17109. The OoO concluded that although there were no "legal issues for reconsideration," the company should "rectify [employee] concerns" by providing relief "consistent with BP's statements at the time in the [RAP]'s promotional material that the plan would be 'as good or better' than the previous retirement plan." ROA.27932, 27936. But the OoO report did not cite any 1989 communication—or any communication, much less a uniform communication—containing the language "as good or better." In reality, the record contains zero evidence that BP America ever promised all RAP participants that their RAP benefit would be "as good or better than," or "at least equal to," their ARP benefit. The district court's findings to that effect were clearly erroneous.

59

Relatedly, the district court also clearly erred when it found that BP America misrepresented the RAP by stating that it would "bear[] the full investment risk" of the plan. ROA.17079, 17096. As precedent and the evidence establish, that was an accurate statement. The RAP, a cash-balance plan, is a defined-benefit pension plan. ROA.17058. In such a plan, the plan sponsor "bears the entire investment risk" because it must fund the promised benefits and "cover any underfunding as the result of a shortfall that may occur from the plan's investments." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999); *see also Hurlic*, 539 F.3d at 1029 (explaining that, in a cash-balance plan, "[t]he participants bear no risk that their accrued benefits will decrease due to investment risk"). Plaintiffs' expert agreed, admitting that it is "true" that "[t]he plan bears the full investment risk." ROA.19561; *see also* ROA.19560 (conceding that "the plan bears the investment risk"). Beyond accurately stating who bore the investment risk, the 1989 materials also disclosed how interest rates affected benefit accruals and explicitly told participants their benefit would be determined in part by "the level of future interest rates." ROA.21220. Accordingly, there is simply no basis in precedent or the record for concluding that BP America did not "bear[] the

60

full investment risk" or that it misrepresented the RAP in making this assertion.

At bottom, BP America's 1989 communications did not contain the "false or misleading statement[s]" required for breach of fiduciary duty. *Vercellino v. Optum Insight, Inc.*, 26 F.4th 464, 469 (8th Cir. 2022); *see also Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 406 (6th Cir. 1998) (no fiduciary-duty breach where "accurate representations of its current program" could not "be deemed misleading" and fiduciary "ha[d] given out no inaccurate information"). That is so even if some participants have accrued (or will accrue) lower benefits under the RAP, because ERISA does not impose any "duty of clairvoyance" to predict future benefits. *Swinney v. Gen. Motors Corp.*, 46 F.3d 512, 520 (6th Cir. 1995). The district court's findings that BP America promised all participants a RAP benefit "as good or better than" or "at least equal to" the ARP benefit, or that it misrepresented the RAP in stating that the RAP "bears the full investment risk," are unsupported by the evidence, inconsistent with case law, and clearly erroneous.

b. <u>The district court clearly erred in finding that "BP specifically knew it shifted a number of financial risks to Plan Participants, to their detriment and to the advantage of BP."</u>

The district court's finding that "BP specifically knew it shifted a number of financial risks to Plan Participants, to their detriment and to the advantage of BP" is also clearly erroneous. ROA.17106. A fiduciary breaches its duties under ERISA when it "participate[s] knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense." *Varity v. Howe*, 516 U.S. 489, 506 (1996). Where a misstatement is unintentional, no breach of fiduciary duty occurs. *See Browdy v. Hartford Life & Accident Ins. Co.*, 630 F.App'x 278, 284 (5th Cir. 2015) ("mere negligence" in communication is "insufficient" for ERISA breach); *Brosted v. Unum Life Ins. Co. of Am.*, 421 F.3d 459, 466 (7th Cir. 2005) (ERISA "breach of fiduciary duty claim premised on a misstatement requires an intent to deceive").

At trial, former BP America employees testified that (i) the conversion to the RAP was not a cost-cutting exercise; (ii) BP America intended to design a benefit comparable to (and, for most employees, better than) the ARP; and (iii) BP America believed it achieved those goals given analyses at the time.

62

These witnesses explained that while the RAP was expected to reduce year-to-year cost *volatility*, ROA.15257-58, 16475-76, 16537-38, it was not intended to reduce overall costs BP America paid to fund the plan, ROA.15892-94, 16017-18, 21507-18 (testimony about "equivalent" long-term costs of each plan). Rather, BP America expected the RAP to impose nearly identical or sometimes higher costs than the ARP. ROA.15316-17, 15975-76, 16397-98. These analyses likewise projected that the present value of benefits was nearly identical under each plan. ROA.15973-74, 16394-96.

This testimony refutes any conclusion that BP America intentionally misrepresented the RAP. At a minimum, it confirms that BP America's 1989 representations were "made in good faith" and "indicated [its] actual intent at the time" of providing benefits comparable under the RAP to those available under the ARP—even if, in retrospect, certain participants did not receive a higher benefit under the RAP. *Swinney v. Gen. Motors Corp.*, 46 F.3d 512, 520 (6th Cir. 1995).

Remarkably, the district court addressed none of this testimony. Instead, adopting Plaintiffs' pre-trial proposed factual findings nearly verbatim, it emphasized certain internal projections suggesting that some participants might receive lower benefits under the RAP. ROA.17064-74.

63

But BP America's 1989 communications conveyed precisely that possibility. *See Matter of Complaint of Luhr Brothers, Inc.*, 157 F.3d 333, 338 (5th Cir. 1998) (noting that where district court's factual findings "are near-verbatim recitals of the prevailing party's proposed findings … we should approach such findings with caution"). Moreover, the district court ignored data from the same materials projecting higher benefits for certain employees under the RAP, depending on retirement age and service years. *See, e.g.*, ROA.28086-93.

The record thus simply does not support that BP America "specifically knew" of risks it shifted to participants "to their detriment and to the advantage of BP." The district court could only reach that conclusion by ignoring contrary testimony of critical witnesses who testified to BP America's good-faith efforts, rendering its finding clearly erroneous.

c.    <u>The district court clearly erred in finding that Defendants violated ERISA by failing to "provide[] class members with a specific comparison of their retirement benefit under the ARP and the RAP."</u>

The district court found that because Defendants failed to "provide[] class members with a specific comparison of their retirement benefit under the ARP and the RAP," they violated ERISA. ROA.17082. But ERISA

64

requires no such comparison. This Court has declined to recognize affirmative disclosure obligations beyond those expressly provided by statute. *See Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 416 (5th Cir. 2003). That is because ERISA already "impose[s] a comprehensive set of reporting and disclosure requirements, which is part of an elaborate scheme ... for enabling beneficiaries to learn their rights and obligations at any time." *Id.*; *see also Ehlmann v. Kaiser Found. Health Plan of Tex.*, 198 F.3d 552, 555 (5th Cir. 2000). Congress could have enacted a requirement that a sponsor disclose individual plan comparisons, but it chose not to do so. *See id.* To engraft such a requirement would disturb ERISA's already-comprehensive disclosure scheme. *Id.*

## IV.    The District Court Abused Its Discretion in Certifying the Class.

Without explanation, the district court accepted the magistrate judge's recommendation and certified a class of "[a]ll persons under age 50 as of January 1, 1989" who were RAP participants on January 1, 1989, and "whose retirement benefit under the [ARP] exceeds the retirement benefit offered (or that will be offered) by the [RAP]." ROA.11261. Because this class fails the ascertainability, commonality, and classwide relief requirements of Rule 23, the district court abused its discretion in certifying the class.

65

## A.    The Class Is Not Ascertainable.

The "existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of" Rule 23. *John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007).  The "touchstone of ascertainability is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *A.A. by & through P.A. v. Phillips*, 2023 WL 334010, at *2 (5th Cir. Jan. 20, 2023).  Although a plaintiff "need not be able to identify every class member at the time of certification," if "'class members are impossible to identify without extensive and individualized fact-finding or "mini-trials,"'" the class fails the ascertainability requirement and cannot be certified.  *Peters v. Aetna Inc.*, 2 F.4th 199, 242 (4th Cir. 2021); *accord Tarrify Props., LLC v. Cuyahoga Cnty.*, 37 F.4th 1101, 1106 (6th Cir. 2022).

Here, "extensive and individualized fact-finding" is necessary to determine who is a member of the class—and, frequently, even that inquiry will not yield answers.  To determine those individuals "whose retirement benefit under the [ARP] exceeds the retirement benefit offered (or that will be offered) by the [RAP]" requires re-creating thirty years of records to recalculate each participant's benefit—records containing gaps and

66

requiring assumptions given the absence of data for a formula unused for three decades. ROA.10093-102. Even then, the difference between ARP and RAP benefit will turn on numerous individualized variables, including age and service as of January 1, 1989; pay level; trajectory of pay growth; choice of benefit commencement date; and level of interest rates used for conversions at that date. ROA.10116-19. These are the precise circumstances where courts have denied class certification on ascertainability grounds. *See Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC*, 91 F.4th 202, 207, 211 (4th Cir. 2024) (rejecting certification where court "could not readily identify the fax recipients eligible for class membership" without "an individualized inquiry as to whether each recipient was using a stand-alone fax machine at the relevant time"); *Marcus*, 687 F.3d at 593-94 (rejecting certification where it could not be known "whether all potential class members' Bridgestone RFTs 'have gone flat and been replaced,' as the class definition requires"); *Duchardt v. Midland Nat'l Life Ins. Co.*, 265 F.R.D. 436, 444 (S.D. Iowa 2009) (rejecting certification where class "cannot be ascertained without extensive individualized inquiries").

Even worse, this highly individualized inquiry to determine whether the ARP or RAP benefit is larger is not even *possible* for some participants—

67

for example, those who are still working.  For such individuals, neither their ARP nor RAP benefit can be calculated until their employment ends. Similarly, a comparison is impossible for ARP participants who left employment before age 55, because no annuity was payable under the ARP until age 55.  ROA.10093-94, 10103.  To satisfy the ascertainability requirement, the "class description" must be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."  7A Fed. Prac. & Proc. §1760 (4th ed.).  Where, as here, a court cannot determine whether entire *categories* of individuals are members, the ascertainability requirement is not satisfied.

Signaling the class's imprecision, even the magistrate judge described the class as ARP participants "who *may well have been impacted* by the misrepresentations alleged in this suit."  ROA.11128 (emphasis added).  He nevertheless concluded the class was ascertainable by relying on *Forbush v. J.C. Penney Co.*, 994 F.2d 1101 (5th Cir. 1993).  But *Forbush* is not even an ascertainability case; the word "ascertainable" appears nowhere in it.  And it is easily distinguishable.  There, the plaintiff challenged a plan's "method of estimating Social Security benefits."  *Id.* at 1103.  The proposed class included participants "whose pension benefits have been or will be reduced

or eliminated as a result of the plan's overestimation of their Social Security benefits." *Id.* The court found that although there would need to be a "subsequent determination[] of individual awards," the alleged overestimation of Social Security benefits was a "common issue" among the class. *Id.* at 1106. That is, because *all* Social Security estimates under the plans were allegedly improper, all plan participants were class members regardless of their specific loss.

Here, by contrast, individual inquiries are necessary not only to calculate damages, but to determine which participants have a RAP benefit lower than ARP benefit and are therefore class members in the first place. Because identifying members of the class is a "complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria"—and, for ARP participants still working or who retired before 55, cannot be determined at all—the class fails the ascertainability requirement. *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 496 (7th Cir. 2012).

### B.    The Class Lacks Sufficient Commonality.

The magistrate judge (and, by extension, district court) likewise erred in determining that Plaintiffs "me[t] the commonality requirement of Rule

23(a)(2)." ROA.11135. "What matters to class certification … is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012). "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes*, 564 U.S. at 350. In evaluating commonality, a court must conduct a "rigorous analysis" with "'specific reference to the claims, defenses, relevant facts, and applicable substantive law raised by the class claims,' … and it must 'address actual or potential differences in purported class members' individual circumstances and claims." *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 547-48 (5th Cir. 2020).

Here, resolution of Plaintiffs' claims required them to show not only that they suffered injury—*i.e.*, had a shortfall between ARP and RAP benefit—but that Defendants' purported ERISA violations caused that injury. Only individualized, not classwide, proof can answer these questions, however; the "[d]issimilarities within" the class "impede the generation of common answers" to them. *Dukes*, 564 U.S. at 350. First,

whether each participant actually suffered a shortfall turns on numerous variables and assumptions. *See* pp.66-68, *supra.* Second, whether each participant suffered that injury because of Defendants' purported violations turns on whether the alleged 1989 misrepresentations caused that participant to decline other employment options or forgo other retirement strategies—the only argument Plaintiffs have offered to establish a causal link between Defendants' ERISA violation and the alleged benefit-shortfall injury (and evidence of which the named Plaintiffs themselves never provided). *See* pp.30-31, *supra.*

The magistrate judge disregarded the individualized inquiries necessary to answer these questions as merely "relate[d] to damage calculations." ROA.11134. That is incorrect; these inquiries are relevant not just for calculating future benefits, but also for determining whether Defendants are liable to a class member in the first place. *See In re Behr Dayton Thermal Prods., LLC*, 2017 WL 11690584, at *9 (S.D. Ohio Mar. 20, 2017) ("[F]act-of-injury and proximate cause are elements of liability rather than damages[.]"). Indeed, Rule 23 commonality is premised on a plaintiff "demonstrat[ing] that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349-50.

Here, Plaintiffs did "not demonstrate[] for purposes of class certification that all members of the proposed class suffered the same injury, because they [did] not show[] that all proposed members suffered *any* injury in fact," *i.e.*, a benefit shortfall. *Tolbert v. RBC Cap. Mkts. Corp.*, 2016 WL 3034497, at *6 (S.D. Tex. May 26, 2016). By focusing on "common questions regarding BP's uniformly disseminated communications and their compliance or noncompliance with ERISA," ROA.11133—which does not answer the key question of whether a putative class member's ARP benefit exceeded his RAP benefit—the magistrate judge "conflate[d] alleged ERISA violations with injury in fact," defeating commonality. *Tolbert*, 2016 WL 3034497, at *6. The magistrate likewise disregarded that whether Defendants' allegedly insufficient communications *caused* that injury cannot be answered through classwide proof but requires highly individualized determinations.

## C.     The Class Does Not Satisfy Rule 23(b)(2).

Finally, the magistrate judge (and district court) erred in finding that Plaintiffs satisfied Rule 23(b)(2). ROA.11140-41. Class certification is proper under Rule 23(b)(2) only where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final

72

injunctive relief or corresponding declaratory relief is appropriate respecting

the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is

'the indivisible nature of the injunctive or declaratory remedy warranted—

the notion that the conduct is such that it can be enjoined or declared

unlawful only as to all of the class members or as to none of them.'" *Dukes*,

564 U.S. at 360. "Rule 23(b)(2) applies only when a single injunction or

declaratory judgment would provide relief to each member of the class." *Id.*

Because the "indivisible injunction" must "benefit[] *all* its members *at

once*," *id.* at 362-63 (emphases added), "if redressing the class members'

injuries requires time-consuming inquiry into individual circumstances or

characteristics of class members or groups of class members," there is "little

value … in proceeding as a class action" under Rule 23(b)(2), *Shook v. Bd. of

Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) (quoting

*Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998)). Accordingly,

"[t]he existence of a significant number of individualized factual and legal

issues … is a proper reason to deny class certification under Rule 23(b)(2)."

*Donelson v. Ameriprise Fin. Servs., Inc.*, 999 F.3d 1080, 1093 (8th Cir. 2021).

And a "claim for class-wide injunctive and declaratory relief does not satisfy

Rule 23(b)(2) if as a substantive matter the relief sought would merely

initiate a process through which highly individualized determinations of liability and remedy are made." *Jamie S.*, 668 F.3d at 499.

Under these principles, the class here suffers from two fundamental defects. First, Plaintiffs neither sought nor obtained "injunctive relief or corresponding declaratory relief," as Rule 23(b)(2) requires. Instead, they sought and obtained "reformation of the Plan." ROA.1935-36. While reformation is another type of equitable relief, Rule 23(b)(2) "does not speak of 'equitable' remedies generally but of injunctions and declaratory judgments" specifically, and reformation "is neither." *Dukes*, 564 U.S. at 365. "As with a statute," a court's "inquiry is complete" if a federal rule's text is "clear and unambiguous." *Bus. Guides, Inc. v. Chromatic Commc'n Enters., Inc.*, 498 U.S. 533, 548-49 (1991). Here, Rule 23(b)(2) clearly and unambiguously requires "injunctive relief or corresponding declaratory relief." Because neither is present here, class certification is improper.

Second, even accepting the magistrate's view that "reformation has been found to be a form of declaratory relief," ROA.11141, here, "redressing the class members' injuries requires time-consuming inquiry into individual circumstances or characteristics of class members or groups of class members," precluding 23(b)(2) certification, *Shook*, 543 F.3d at 604. As

74

explained, whether each class member is entitled to relief depends on "highly individualized determinations" of each member's (i) loss, if any, of benefits under the RAP versus the ARP, and (ii) whether Defendants' alleged violations caused that loss. *Jamie S.*, 668 F.3d at 499. Because there is no "indivisible injunction benefiting all [class] members at once," *Dukes*, 564 U.S. at 362-63, a 23(b)(2) class cannot be certified.

## CONCLUSION

The Court should reverse the district court's judgment.

July 7, 2025

Respectfully submitted,

s/ *George W. Hicks, Jr.*

Ian H. Morrison
SEYFARTH SHAW, L.L.P.
Suite 8000
233 S. Wacker Drive
Chicago, IL 60606
(312) 460-5830
imorrison@seyfarth.com

George W. Hicks, Jr.
  *Counsel of Record*
Megan L. McGlynn
Alanna Ruth Carden
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
george.hicks@kirkland.com

*Counsel for Appellants*

76

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing appellate brief was filed electronically on July 7, 2025, and will, therefore, be served electronically upon all counsel.

s/ *George W. Hicks, Jr.*
George W. Hicks, Jr.

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief complies with Fed. R. App. P. 32(a)(7)(B) and (C) and this Court's June 25, 2025, order granting Appellants' motion to file an opening brief not exceeding 15,000 words, because it contains 14,997 words. The brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because it has been prepared in a proportionally spaced, roman style typeface of 14 points or more.

s/ *George W. Hicks, Jr.*
George W. Hicks, Jr.